(No. 70592.—

JOHN J. RAUH, Appellee, v. ROCKFORD PRODUCTS
CORPORATION, Appellant.

*Opinion filed May 30, 1991.*

CALVO, BILANDIC and HEIPLE, JJ., took no part.

Charles R. Kaufman, John A. Relias and C. Elizabeth Belmont, of Vedder, Price, Kaufman & Kammholz, of Chicago, for appellant.

Jeremiah Marsh, Michael M. Conway and Nancy Townsend Beggs, of Hopkins & Sutter, of Chicago, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

John J. Rauh (Rauh) filed a complaint in the circuit court of Cook County pursuant to the Uniform Arbitration Act (Ill. Rev. Stat. 1987, ch. 10, par. 101 *et seq.*) to

vacate or modify an arbitration award which upheld Rauh's discharge as chairman, president, and chief executive officer of Rockford Products Corporation (Rockford Products). Rockford Products filed a counterclaim for attorney fees and costs. The circuit court affirmed the arbitrator's award in all respects. The appellate court reversed and remanded the matter, ordering that the award be vacated. (201 Ill. App. 3d 361.) The appellate court held that the arbitrator exceeded her powers by upholding the discharge under section 8.0, a section of the parties' employment agreement not specifically cited by Rockford Products in discharging Rauh. Further, the appellate court stated that the arbitrator misconstrued section 8.0 so seriously as to constitute manifest disregard of the agreement. The appellate court also held that the trial court properly denied Rockford Products' claim for attorney fees. 201 Ill. App. 3d at 367.

Rockford Products appeals to this court, asserting that the appellate court erred in holding that the arbitrator exceeded her powers and misinterpreted section 8.0 of the employment agreement, and also erred in denying attorney fees and costs. Rauh responds by asserting that he is entitled to attorney fees. For the reasons stated below, we reverse the appellate court's holding except as to Rockford Products' claim for attorney fees, and affirm the circuit court's order upholding the arbitrator's award in all respects.

## FACTS

At the arbitration hearing, the parties presented documentary evidence in addition to the testimony of Rauh and nine other witnesses. The evidence revealed that Rauh was hired as president of Rockford Products in 1984 by Rexnord, Inc., Rockford Products' parent company at the time. In June 1985, after learning that Rexnord planned to sell Rockford Products, Rauh proposed

to the other officers of Rockford Products that they purchase Rockford Products, in order to avoid a buyout by unknown outsiders. The other officers agreed, and on December 5, 1985, they and Rauh finalized the purchase of Rockford Products. Rauh was elected chairman, president and chief executive officer.

As part of the purchase of the company, Rauh bought 12,500 shares of company stock for $250,000, and the other officers purchased lesser amounts of shares. Rockford Products also entered into loan agreements with outside lenders, BT Commercial Corporation, AMCORE Bank of Rockford, and Old Stone Bank of Providence, Rhode Island. These lenders provided Rockford Products a term loan of $10 million and a $12 million revolving line of credit. The loan agreements contained earnings covenants, pursuant to which Rockford Products was expected, among other things, to earn approximately $2.6 million to $2.8 million during fiscal year 1986. The lenders had liens on Rockford Products' assets, and it was agreed that the lenders could request that the entire loan be made due upon a default under the earnings covenants.

On November 15, 1985, Rauh executed an employment agreement with Rockford Products providing for a five-year term of employment, with successive one-year terms under specified conditions. The agreement also contained an arbitration provision that "[a]ny controversy or claim arising out of or relating to this Agreement or any alleged breach hereof shall, upon request by either party, be submitted to arbitration."

Several witnesses testified that Rockford Products suffered from financial difficulties during fiscal year 1986. AMCORE Bank's Robert Mueleman testified that Rockford Products' financial performance in fiscal year 1986 was "severely disappointing"; the company's sales and earnings violated covenants in the loan agreements;

and Rockford Products was in default of the loan agreements in several areas. On December 3, 1986, the lenders conferred with Rockford Products' senior management. Mueleman testified that the lenders expressed concern over the "seriousness of the shortfall" in earnings and financial performance, and revised their projections for fiscal year 1987. Mueleman stated that Rockford Products' officers were not prepared to answer the lenders' questions. Further, the lenders were disappointed that when asked questions, Rauh deferred to other officers. Mueleman believed that the company failed to convey confidence regarding future financial performance.

Mueleman stated that "[a]s a group, the bankers thought the company was in crisis." At a meeting on December 10, 1986, the lenders again expressed their concern over the financial condition of the company and developed a revised budget. Mueleman was disappointed when Rauh apologized to the other officers for their getting involved in the company, taking a financial risk, and putting their time and money into the company. Mueleman stated that Rauh gave the impression that the company was a failure and that "it was time to give up." Further, Rauh showed a lack of leadership. The other officers, when asked individually, expressed their continued confidence in the company. Mueleman suggested to Rauh that he receive training for building confidence and making effective presentations.

On December 12, 1986, the lenders again met with Rockford Products' officers. The lenders agreed to waive the company's violations for fiscal year 1986, and proposed covenants for 1987 based upon a plan to be submitted by Rockford Products.

At the regular directors and officers' meeting of Rockford Products in January 1987, Rauh again was unanimously voted in as chairman, president, and chief

executive officer. Also during that month, the lenders again met with the officers. Rockford Product's Dennis Schaer testified that the lenders had lost confidence in the management group. At the request of the lenders, Rockford Products hired Buccino & Associates, an outside consulting firm, which prepared a report containing specific proposals to cut inventory and reduce employee wages. On February 18, 1987, all of the officers agreed that the proposed cuts were too drastic and that a modified plan should be submitted to the lenders. The officers agreed to review their own departments for making suggested cuts.

Later on Wednesday, February 18, Rauh left for California to attend a trade show that would take place the following Monday, February 23. Prior to Rauh's leaving, one officer stated that perhaps it would be better if Rauh did not go. Rauh responded that he would attend the show, and that the officers in the meantime had the opportunity to develop their proposed departmental cuts. On Friday, February 20, Rauh telephoned and spoke with all of the officers regarding the proposed cuts. Not all of the officers were prepared with their proposals. Rauh was told that one of the lenders had again expressed concern over the urgency of the situation. Rauh called the lender and they agreed to discuss the proposed cuts on the following Tuesday. Rauh again telephoned the officers at Rockford Products, and informed them that he would review the proposed cuts with them when he returned to the office on Tuesday.

On Saturday, February 21, three of the officers had a "spontaneous meeting" during which they discussed their concern over the financial condition of the company and that Rauh had left during a critical time. They agreed that Rauh should be discharged. The officers then spoke to counsel for the company and the other officers regarding the discharge. On Monday, February 23, the officers

met with one of the company's outside directors. It was agreed that a directors' meeting would be held on Thursday, February 26, with notice to all directors. On February 24, Rauh returned to the office and was told that the meeting was scheduled to discuss his discharge.

On February 26, the board of directors unanimously voted to discharge Rauh. The minutes of the meeting indicate that Rauh's termination was being considered because of his "failure to fulfill effectively the duties of his office" and his lack of "competen[ce] to provide the leadership to the Corporation needed to achieve the improvements *** to satisfy lenders to the Corporation and place it on a sufficiently profitable footing." Further, Rauh charged personal expenses to the company and appeared to be under the influence of alcohol at a company meeting. The company's secretary determined that section 8.1 of the employment agreement was the relevant section for the termination of Rauh. One of the board's resolutions provides that Rauh was terminated "for cause on 10 days' notice pursuant to Section 8.1 of said Agreement." On February 26, Rauh received written notice of his discharge in accord with the board's resolutions and pursuant to section 8.1 of the employment agreement.

## ARBITRATOR'S AWARD

Rauh filed a demand for arbitration alleging that his dismissal was without cause and therefore was in breach of the employment agreement. The arbitrator initially found that the "perks" Rauh enjoyed were known and authorized by the company officers at the time of Rauh's reelection, and therefore could not sustain a finding of cause or serve as grounds for termination. The arbitrator then turned to the question of whether Rauh's alleged lack of leadership was cause for termination. The arbitrator found that Rauh failed to provide the leadership necessary to his position. The arbitrator also found

that the employment agreement required Rauh to perform duties of the same character as those ordinarily performed by persons in the same position, that is, chief executive officer. The arbitrator cited Rauh's lack of leadership in dealing with the lenders, and his absence for several days during the "lender crisis."

The arbitrator stated that generally, "cause" can be construed as assuming employee control over the reason for termination, such as misconduct, or something outside of the control of the employee. The arbitrator found that "cause" in section 8.1 of the agreement assumes employee control over the reason for dismissal, since section 8.0 pertains to reasons beyond the employee's control. The arbitrator found that Rauh's lack of leadership constituted a matter beyond his control. The arbitrator ruled that Rauh's conduct therefore violated section 8.0 of the employment agreement, regarding termination for matters "beyond the control of the employee." Since section 8.0 required that the company give a 30-day notice of termination, rather than a 10-day notice as required by section 8.1, Rockford Products breached the agreement by failing to give 30 days' notice, and Rauh was entitled to his salary for the additional 20 days. Rauh moved to modify the award, and Rockford Products filed an application for attorney fees pursuant to section 8.2 of the agreement. On July 5, 1988, the arbitrator issued a supplemental order upon the motions in which she further explained her reasons for finding that section 8.0 of the agreement applied to Rauh's termination. The order also denied attorney fees to either party.

## DISCUSSION

### I. Scope of Arbitrator's Award

On appeal Rockford Products initially contends that the appellate court erred in holding that the arbitrator

exceeded her powers in relying upon section 8.0 of the employment agreement. Rockford Products asserts that the issue before the arbitrator was whether Rauh's termination violated any section of the employment agreement. Further, since the parties' contract provides that any and all disputes arising out of the contract will be submitted to arbitration, the arbitrator was empowered to consider all issues before her and make an award which completely resolved the dispute before her.

Sections 8.0 and 8.1 of the parties' agreement provide:

> "8.0  If Executive fails (for reasons other than disability, death, breach of this Agreement by Company, or other reason beyond his control) to perform any of his agreements herein provided and such failure continues for a period of 30 days after Company shall have notified him in writing of such failure, Company shall have the right to terminate this Agreement by .written notice to Executive.
>
> 8.1  Company may also terminate this Agreement on 10 days' notice for cause, including without limitation disloyalty to Company, dishonesty in the conduct by Executive of his position hereunder, failure or refusal to perform any reasonable assignment properly given to him within the capacity in which he is employed hereunder, his violation of any agreement contained herein or his performance of any act which is contrary to the customary standards of conduct observed by employees of comparable status."

It has long been the view of this court that arbitration awards should be construed, wherever possible, so as to uphold their validity. (*Merritt v. Merritt* (1850), 11 Ill. 565.) Further, there is a presumption that the arbitrator did not exceed her authority. *Darst v. Collier* (1877), 86 Ill. 96; see also *White Star Mining Co. v. Hultberg* (1906), 220 Ill. 578.

Section 12 of the Uniform Arbitration Act (Ill. Rev. Stat. 1987, ch. 10, par. 112) sets forth the grounds for vacating an award. Section 12(a)(3), relied upon by Rauh, provides, in pertinent part:

"Vacating an award. (a) Upon application of a party, the court shall vacate an award where:

\* \* \*

(3) The arbitrators exceeded their powers." Ill. Rev. Stat. 1987, ch. 10, par. 112(a)(3).

While the Act sets forth grounds and procedures for a court to vacate arbitrators' awards, the Act does not control which issues are subject to arbitration. Rather, the agreement of the parties governs which issues are subject to arbitration. (*Flood v. Country Mutual Insurance Co.* (1968), 41 Ill. 2d 91, 93.) The parties to an agreement are bound to arbitrate only those issues which by clear language and their intentions expressed in the language show they have agreed to arbitrate. (*Flood*, 41 Ill. 2d at 94; see *Security Mutual Casualty Co. v. Harbor Insurance Co.* (1979), 77 Ill. 2d 446, 449-50.) That is, arbitration agreements cannot be extended by construction or implication. (*Flood*, 41 Ill. 2d at 94.) "In construing instruments of submission to arbitration, courts always give as large a construction to them, as the words of the instrument and the intentions of the parties, drawn from their expressions, will warrant." *Ross v. Watt* (1854), 16 Ill. 99, 102; *Security Mutual Casualty Co.*, 77 Ill. 2d at 449-50. See also *Podolsky v. Raskin* (1920), 294 Ill. 443.

Rockford Products points out that no agreed submission was presented to the arbitrator. However, the documents presented to the arbitrator indicate that consideration of section 8.0 of the agreement was properly before her. For example, Rauh's demand for arbitration states, "This termination was without cause and violates the terms of the November 15, 1985, Employment

Agreement." Further, Rauh's demand sought broad relief, including payment of salary and benefits, repurchase of his stock, cancellation of a covenant not to compete, attorney fees, and other relief "pursuant to the Agreement." In addition, Rauh submitted an American Arbitration Association Demand for Arbitration form in which he did not cite specific sections of the employment agreement, but merely attached and incorporated his demand for arbitration. Finally, the arbitrator's statement of the issue was very broad: "Was the termination of the employment of the Claimant by the Respondent a breach of the employment contract between them, and if so, what is the appropriate measure of damages?"

Rauh responds that the demand for arbitration made no mention of section 8.0 of the agreement and requested decision only of whether termination "for cause" was proper under section 8.1. Rauh also asserts that the minutes of the board meeting, submitted by Rockford Products, cite only section 8.1 of the agreement as the basis for termination.

We find that the documents submitted by the parties and the parties' reliance on those documents at the hearing show their intent to submit for consideration the termination of Rauh pursuant not just to section 8.1, but to the agreement as a whole. First, the arbitration paragraph of the employment agreement provides, in pertinent part:

> "15.0  Any controversy or claim arising out of or relating to this Agreement or any alleged breach hereof shall, upon request by either party, be submitted to arbitration ***. The award rendered by the arbitrator shall be conclusive and binding upon the parties."

The arbitration provision is general, providing that all claims relating to a breach are subject to arbitration. This provision does not limit the issues submitted.

In addition, Rauh's demand for arbitration fails to limit the arbitrator's consideration of the agreement only to section 8.1. The demand is drawn in 22 numbered paragraphs and describes in some detail the parties, background, the employment agreement, termination, and the prayer for relief. The demand cites nine particular sections of the employment agreement, in addition to sections 8.1 and 8.2 (regarding attorney fees). Thus the demand implies that Rauh intended that the arbitrator look to the agreement in its entirety to decide the issues before her. Further, as argued by Rockford Products, Rauh's demand seeks broad relief, and Rauh failed to limit the issue in his American Arbitration Association demand form to interpretation only of section 8.1.

Additionally, extensive evidence was presented by the parties regarding the circumstances surrounding Rauh's employment history and termination. Sections 8.0 and 8.1 were the only sections of the parties' agreement regarding grounds for termination. It cannot be fairly said that the evidence presented was so narrowly tailored as to apply only to application of section 8.1 of the agreement, to the exclusion of section 8.0. Under the circumstances of the instant case, including the written submissions of the parties and the scope of evidence presented at the arbitration hearing, we find that the arbitrator did not exceed her powers in considering both sections 8.0 and 8.1 of the parties' agreement and determining the question of whether Rauh's termination violated section 8.0.

## II. Arbitrator's Interpretation of the Agreement

Rockford Products next contends that the appellate court erred in finding that the arbitrator's award was not based upon a proper interpretation of the employment agreement. Rockford Products contends that, in reaching its result, the appellate court misapplied the

standard in *Garver v. Ferguson* (1979), 76 Ill. 2d 1, regarding application of section 12(a)(3) of the Act (Ill. Rev. Stat. 1987, ch. 10, par. 112(a)(3)). In addition, Rockford Products contends that the arbitrator's specific findings regarding Rauh's failure to perform his duties under the employment contract were sufficient to support her decision that Rauh was discharged for cause. Both sections 8.0 and 8.1 of the agreement provide that failure to perform under the terms of the agreement is cause for discharge.

Rauh responds that the arbitrator's interpretation did not "draw its essence" from the parties' agreement. Rauh asserts that the arbitrator disregarded the actual terms of the agreement, and therefore the award should be vacated. Rauh cites *Roadmaster Corp. v. Production & Maintenance Employees' Local 504* (7th Cir. 1988), 851 F.2d 886, *Hill v. Norfolk & Western Ry. Co.* (7th Cir. 1987), 814 F.2d 1192, and *Zeigler Coal Co. v. District 12, United Mine Workers* (C.D. Ill. 1980), 484 F. Supp. 445. Further, Rauh asserts that the arbitrator refused to hear material evidence regarding section 8.0 of the parties' agreement, and therefore the award should be vacated pursuant to section 12(a)(4) of the Act (Ill. Rev. Stat. 1987, ch. 10, par. 112(a)(4)).

First, since Rauh has not cross-appealed, we need not address his argument regarding the arbitrator's refusal to hear evidence. However, even assuming *arguendo* that this issue is properly before us, we find no merit in the argument, since the record fails to show that the arbitrator excluded any material evidence offered by the parties.

Second, we do not accept Rauh's assertion that the analysis in the instant case is whether the arbitrator's interpretation "drew its essence" from the contract. The cases cited by Rauh involve the interpretation of the Federal Arbitration Act (9 U.S.C. §1 *et seq.* (1988)) and

other Federal labor statutes, and the standard for reviewing an award based upon a collective-bargaining agreement. (See also *United Steelworkers of America v. Enterprise Wheel & Car Corp.* (1960), 363 U.S. 593, 597, 4 L. Ed. 2d 1424, 1428, 80 S. Ct. 1358, 1361; *Miller Brewing Co. v. Brewery Workers Local Union No. 9* (7th Cir. 1984), 739 F.2d 1159.) Under the circumstances of the instant case, we decline to follow that line of cases. Rather, we look to the language of the Illinois Act, which sets forth the grounds for vacating an award (Ill. Rev. Stat. 1987, ch. 10, pars. 112(a), (e)). Further, as we held above, the question of whether the termination violated section 8.0 of the parties' agreement was properly before the arbitrator.

We agree with Rockford Products that the appellate court misapplied the standard set forth in *Garver*. In *Garver*, this court looked to section 12(a)(3) of the Act (Ill. Rev. Stat. 1975, ch. 10, par. 112(a)(3)), and held that an arbitrator's award will not be set aside for errors in judgment or mistakes of law or fact. (*Garver*, 76 Ill. 2d at 7-8.) This holding accords with long-established case law regarding arbitration agreements. *Burchell v. Marsh* (1855), 58 U.S. (17 How.) 344, 349, 15 L. Ed. 96, 99; *Ross v. Watt* (1854), 16 Ill. 99, 102; *White Star Mining Co. v. Hultberg* (1906), 220 Ill. 578, 609; *Podolsky v. Raskin* (1920), 294 Ill. 443, 450.

Illinois adopted the Uniform Arbitration Act in 1961. The Uniform Act was promulgated by the National Conference of Commissioners on Uniform State Laws in 1955. In determining the proper standard to be applied in construing section 12(a)(3) of the Act, we have looked to the explanation of the chairman of the committee which drafted the Uniform Act:

"[T]he question for the court is whether the construction of the contract made by the arbitrator is a reasonably possible one that can seriously be made in the context in

which the contract was made. Stated affirmatively, if all fair and reasonable minds would agree that the construction of the contract made by the arbitrator was not possible under a fair interpretation of the contract, then the court would be bound to vacate or refuse to confirm the award." Pirsig, *Some Comments on Arbitration Legislation and the Uniform Act*, 10 Vand. L. Rev. 685, 706 (1957).

See *Garver*, 76 Ill. 2d at 9-10.

After setting forth the *"all* fair and reasonable minds" (emphasis added) standard, the appellate court in the instant case held that "[f]air and reasonable minds would not agree that the [arbitrator's] decision is a valid interpretation of section 8.0" (201 Ill. App. 3d at 366). Even if the appellate court's holding can somehow be construed as applying the correct standard, nevertheless we disagree with the outcome. After reviewing the record, we find that the arbitrator's interpretation of the parties' contract is a reasonably possible one that can seriously be made within the context in which Rauh and Rockford Products entered the contract. Further, we do *not* find that all fair and reasonable minds would agree that the construction of the contract was not possible under a fair interpretation of the contract.

The arbitrator heard the testimony of a number of witnesses that Rauh had failed, during a critical financial period, to instill confidence in the company or to take sufficient action to attempt to resolve the company's financial condition. The arbitrator noted that the employment agreement required Rauh to perform duties of the same character as those ordinarily performed by a chief executive officer, including the duty of showing leadership. The arbitrator found that Rauh lacked the leadership necessary to his position, as demonstrated by his poor handling of the "lender crisis." Further, the contract required that Rauh devote his full time to the com-

pany; however, Rauh was absent for several days during a critical financial period. Sections 8.0 and 8.1 of the agreement are the only sections which provide the methods for termination upon proper grounds. The arbitrator determined that Rauh had failed to perform properly under the contract, and looked to sections 8.0 and 8.1 to determine whether the grounds and method of termination were in accord with the parties' agreement.

Even if, as Rauh asserts, the arbitrator misinterpreted the meaning of the notice provisions of sections 8.0 or 8.1 or the provisions regarding which matters were beyond the employee's control, nevertheless, we believe that the arbitrator's interpretation was a reasonably proper one and fails to meet the test in *Garver* for vacating an award. Gross errors of judgment in law or a gross mistake of fact are not grounds for vacating an award unless the mistakes or errors are apparent upon the face of the award. (*White Star Mining Co. v. Hultberg* (1906), 220 Ill. 578; *Garver*, 76 Ill. 2d at 7-8.) Since we do not find any gross errors of judgment in law or gross mistakes of fact on the face of the award, and for the other reasons stated above, we find no grounds for vacating the arbitrator's award.

### III. Attorney Fees

Next, Rockford Products contends that it is entitled to attorney fees and costs pursuant to section 8.2 of the employment agreement, which provides, in pertinent part:

> "8.2 Upon termination under this 8, all payments to Executive \*\*\* shall immediately cease. The party prevailing in any arbitration \*\*\* over whether or not there exists or existed cause sufficient to entitle Company to terminate Executive's employment hereunder shall be entitled to recover, in addition to any other relief, his or

its costs and expenses, including reasonable attorneys' fees, incurred in connection with such proceeding."

Rockford Products asserts that since it prevailed in the arbitration, it is entitled to costs and attorney fees. Rockford Products fails, however, to assert on what basis the arbitrator improperly denied attorney fees, or on what basis the lower courts erred with regard to the attorney fees issue. That is, Rockford Products fails, in this court or in the courts below, to specify a provision of the Act which the arbitrator's denial of attorney fees purportedly violated. Rockford Products merely proposes its own interpretation of section 8.2 of the agreement in relation to its reading of the arbitration award. In response, Rauh proposes another interpretation of section 8.2, which would allow *him* to recover attorney fees.

The parties thus apparently request that this court interpret the parties' agreement and the findings of the arbitrator to determine whether either is entitled to attorney fees. However, we lack the authority to interpret and apply a section of the parties' agreement. Section 15 of the parties' agreement provides that the arbitrator's award "shall be conclusive and binding upon the parties." Further, it is well-established that judicial review of an arbitrator's award is intended to be more limited than appellate review of a trial court's decision. (*Bernhardt v. Polygraphic Co. of America, Inc.* (1956), 350 U.S. 198, 203, 100 L. Ed. 199, 205, 76 S. Ct. 273, 276; see *Garver v. Ferguson* (1979), 76 Ill. 2d 1.) As the Supreme Court stated in *Burchell v. Marsh* (1855), 58 U.S. (17 How.) 344, 15 L. Ed. 96:

> "Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes it should receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the par-

ties, a court of equity will not set it aside for error either in law or fact. A contrary course would be a substitution of the judgment of the Chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation." (*Burchell*, 58 U.S. at 349, 15 L. Ed. at 99.)

This rationale also applies to this court of review. In light of this policy, and absent any other statutory ground for vacating or modifying the award, we find no basis for disturbing the arbitrator's finding regarding attorney fees.

### IV. Question of New Arbitration Hearing

Finally, Rockford Products contends that if this court affirms the appellate court's holding regarding whether the arbitrator exceeded her powers and misinterpreted the employment agreement, then the instant matter should be remanded for a new arbitration. However, in light of our holding as set forth above, we need not address this argument.

For the foregoing reasons, the decision of the appellate court is affirmed in part and reversed in part, and the circuit court is affirmed.

*Appellate court affirmed in part*
*and reversed in part;*
*circuit court affirmed.*

JUSTICES CALVO, BILANDIC and HEIPLE took no part in the consideration or decision of this case.